## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Augustin B., | Civ. No. 19-296 (ECT/BRT) |
| Petitioner, | |
| v. | **REPORT AND RECOMMENDATION AND ORDER** |
| Secretary of Homeland Security, et al., | |
| Respondents. | |

Augustin B., *pro se* Petitioner.

Friedrich A. P. Siekert, Esq., Assistant United States Attorney, counsel for Respondents.

BECKY R. THORSON, United States Magistrate Judge.

In this petition for a writ of habeas corpus under 28 U.S.C. § 2241, Petitioner Augustin B. requests release from immigration detention pending his removal from the United States. (Doc. No. 1, Habeas Pet.) For the reasons stated below, this Court recommends that Petitioner's action be dismissed.

**I.    Background**

On December 14, 2000, Petitioner was admitted into the United States at New York, New York, as a B-1 Visitor. (Doc. No. 8, Declaration of Richard Pyrd ("Pyrd Decl.") ¶ 6.) Petitioner entered the country with a Mali passport issued to an individual named Lassine Kone. (*Id.*)

Several years later, Petitioner attempted to adjust his status to lawful permanent resident based on his I-485 application and a visa petition filed by his then wife, Jamie Nash. (*Id.* ¶ 7.) The United States Citizenship and Immigration Services ("USCIS") denied the I-485 and the visa petition. (*Id.* ¶¶ 7–9.)

On October 28, 2005, USCIS issued a Notice to Appear ("NTA") in removal proceedings under Section 240 of the Immigration and Nationality Act to Petitioner a/k/a Lassine Kone. (*Id.* ¶ 10, Ex. A.) Petitioner was charged as removable as an alien present in the United States in violation of the Immigration and Nationality Act and because he failed to maintain the nonimmigrant status under which he had been admitted. (*Id.*)

On November 21, 2005, ICE arrested Petitioner in Boulder, Colorado, and re-served the previously issued NTA in person. (*Id.* ¶ 11, Ex. A at 2.) On December 27, 2005, an immigration judge in Denver ordered Petitioner (under the alias Kone) removed from the United States to Mali. (*Id.* ¶ 12, Ex. B.) Petitioner filed an appeal with the Board of Immigration Appeals ("BIA"). (*Id.* ¶ 12, Ex. C.) On January 3, 2006, ICE Enforcement and Removal Operations ("ERO") released Petitioner and placed him on the Intensive Supervision Appearance Program ("ISAP") while his appeal with the BIA was pending. (*Id.* ¶ 13.)

On June 28, 2007, the BIA dismissed Petitioner's appeal. (*Id.* ¶ 14, Ex. D.) With the BIA decision, Petitioner's removal order became administratively final, and on July 20, 2007, ERO Denver arrested Petitioner and terminated his participation in the ISAP program. (*Id.* ¶ 15.)

Petitioner again tried to adjust his status to that of a lawful permanent resident. On October 2, 2007, USCIS received a Petition for Alien Relative, Form I-130, submitted by

Katherine Knight, as the second wife and on behalf of Petitioner (using the alias Lassine Kone). (*Id.* ¶ 16.) On October 10, 2007, ERO Denver released Petitioner on an Order of Supervision pending a decision on the I-130. (*Id.* ¶ 17.) On November 20, 2008, USCIS denied Katherine Knight's I-130 petition on behalf of Petitioner. (*Id.* ¶ 18.)

On June 10, 2009, ERO Denver, through its sub-office in Grand Junction, Colorado ("ERO Grand Junction"), fingerprinted Petitioner after receiving intelligence that Petitioner was using the identity of Lemen Tounkara, an Algerian citizen. During questioning, Petitioner admitted to ERO officers that his true name was Augustin B., a native and citizen of Guinea. Petitioner also admitted he gained his original admission to the United States using a fraudulent B-1 visa in conjunction with a real Mali passport that was not his. Petitioner further admitted his father and mother both were natives and citizens of Guinea. Petitioner admitted he did not have a fear of persecution or torture if he were to be removed from the United States. Accordingly, ERO Grand Junction revoked Petitioner's Order of Supervision and detained him in immigration custody. (Pyrd Decl. ¶ 19, Exs. E and F.)

On June 11, 2009, ERO officers in ERO Grand Junction allowed Petitioner to call his mother. Petitioner claimed his mother's name was Odile Keita, a citizen and national of Guinea, who was residing in Conakry, Guinea. ERO officers also allowed Petitioner to call the Embassy of Guinea. (*Id.* ¶ 20.)

On June 30, 2009, Petitioner confirmed in a sworn statement to ERO officers that his true name was Augustin B; he was born on April 25, 1979, in Conakry, Guinea; he was a citizen and national of Guinea; he was admitted on a visitor visa in New York; and

3

he had no fear of persecution or torture should he be removed from the United States. (*Id.* ¶ 21, Ex. G.)

On August 9, 2009, ERO Grand Junction released Petitioner on an Order of Supervision pending his removal from the United States. (Pyrd Decl. ¶ 22.) Nine years later, on October 4, 2018, ERO St. Paul, Minnesota arrested Petitioner at the St. Paul Field Office due to advice from ERO Headquarters that there was a significant likelihood of Petitioner's removal in the reasonably foreseeable future, that a travel document was expected to be issued within thirty days, and that Petitioner would be manifested on the next available charter. (*Id.* ¶ 23, Ex. H.) During processing, Petitioner initially refused to provide a sworn statement. (*Id.* ¶ 23, Ex. I.) ERO St. Paul advised Petitioner of his right to speak to the Embassy of Guinea, which he accepted. During Petitioner's telephone conversation with the Embassy of Guinea, it is believed that Petitioner stated to the representative that he was not a citizen or national of Guinea. (*Id.*) ICE/ERO also heard Petitioner state that he came from Mali, at which point the Embassy ended the telephone call. (*Id.*) Also during processing, Petitioner claimed that his father and mother both had passed away in Guinea. (*Id.*)

On October 10, 2018, ICE issued a Warrant of Removal/Deportation regarding Petitioner, which Petitioner refused to sign or affix his fingerprint. (*Id.* ¶ 24, Ex. J.) On October 10, 2018, ICE issued a Notice of Revocation of Release to Petitioner. (*Id.* ¶ 25, Ex. K.) On October 16, 2018, ERO St. Paul served Petitioner a Warning for Failure to Depart, Form I-229(a). (*Id.* ¶ 26, Ex. L.)

On November 19, 2018, Petitioner agreed to answer questions via a sworn statement. (*Id.* ¶ 27, Ex. M.) In the sworn statement, Petitioner stated that he was born in

4

Conakry, Guinea on April 25, 1979, and was a citizen and national of Guinea. Petitioner also stated that his father was born in Guinea and was a citizen and national of Guinea, but had passed away in Guinea. Petitioner also stated that his mother's real name is Odille Andouno, not Odile Keita, as he previously maintained. Petitioner stated that his mother was born in Liberia, but was a citizen and national of Guinea and was currently residing in Guinea. (*Id.* ¶ 27.)

On November 29, 2018, ICE Headquarters, Removal and International Operations ("HQ/RIO") notified ERO St. Paul that Petitioner would be manifested and removed on the next West African ICE Air charter. HQ/RIO stated that the Government of Guinea was hesitant to issue a travel document for Petitioner due to his history of fraud and misleading statements, but that HQ/RIO was confident a travel document would be forthcoming. (*Id.* ¶ 28.) Accordingly, on December 5, 2018, ERO St. Paul transferred Petitioner to ERO El Paso, Texas for staging. (*Id.* ¶ 29.)

On December 7, 2018, ERO officers in El Paso requested and offered assistance to Petitioner to reach out to his mother in Guinea in order to procure an identity document. At that time, Petitioner stated to the officers that his mother was born in Liberia and resided in Liberia, but she had no telephone and he would not be able to contact her. (*Id.* ¶ 30.) HQ/RIO pulled Petitioner from the charter because Guinea was not prepared to issue a travel document at that time, but would continue to investigate Petitioner's claim to citizenship. (*Id.* ¶ 31.)

On December 31, 2018, ICE issued a Decision to Continue Detention for Petitioner. (*Id.* ¶ 32, Ex. N.) On January 3, 2019, Petitioner was transferred back to the St. Paul Field Office. (*Id.* ¶ 33.)

On January 8, 2019, ERO St. Paul issued a Notice of Failure to Comply, informing Petitioner that ICE had determined that Petitioner would not be released from custody, that Petitioner was willfully and deliberately interfering with his removal from the United States, and that as a result, Petitioner's removal period was extended. Petitioner was served with this Notice on January 11, 2019, at the Sherburne County Jail. (*Id.* ¶ 34, Ex. O.)

On April 30, 2019, ICE/ERO received a travel document for Petitioner from the Government of Mali. (Doc. No. 15, Supplemental Declaration of Richard Pyrd ("Supp. Pyrd Decl.") ¶ 5.)[1] On May 29, 2019, ERO officers attempted to remove Petitioner from the United States to Mali via commercial airlines. (*Id.* ¶ 6.) Shortly before departing Fort Snelling, ERO officers briefed Petitioner on the impending departure. (*Id.*) After viewing the travel document, Petitioner claimed that he would not allow the officers to remove him, stating that the travel document was fake. (*Id.*) Officers stated that the travel document was not fraudulent and was issued by the Government of Mali. (*Id.*)

Officers then transported Petitioner to the Minneapolis-St. Paul International Airport. (*Id.* ¶ 7.) During the drive, Petitioner stated many times that officers were kidnapping him, illegally removing him from the United States, and that he would not comply with removal. (*Id.*) In the airport parking lot, ERO officers removed Petitioner's leg irons and allowed him to exit the vehicle. (*Id.*) At this time, Petitioner attempted to shove one of the escorting officers and move away. (*Id.*) Officers attempted to control

---

[1] The travel document was issued under the name Lassine Kone, a known alias of Petitioner. Petitioner applied for and received a Mali passport twice since 2005 using the name Lassine Kone. (*See* Doc. Nos. 12, 12-1.)

6

Petitioner who began twisting and turning in an attempt to break away from the escorting officers. (*Id.*) Petitioner ignored numerous commands to stop resisting, and he was "escorted to the ground" where he continued to attempt to break free and resist. (*Id.*) Officers were able to place Petitioner in leg irons and informed Petitioner that they would return him back to Fort Snelling. (*Id.*) Petitioner continued to resist and yell while being transported back to Fort Snelling. (*Id.*) Additional officers were needed in the sally port to control Petitioner upon returning to Fort Snelling. (*Id.*)

That same day, on May 29, 2019, HQ/RIO was notified that Petitioner failed to comply with commercial removal. (*Id.* ¶ 9.) HQ/RIO stated that Petitioner would be manifested on an upcoming West African ICE charter. (*Id.*) Petitioner has now been manifested on a charter scheduled to depart in late July 2019. (Doc. No. 31, Second Supplemental Declaration of Richard Pyrd ("Second Supp. Pyrd Decl.") ¶ 6.) While HQ/RIO has a valid unexpired travel document in hand for Petitioner, HQ/RIO has requested that the Mali Embassy reissue an updated travel document and is "completely confident" that the Mali Embassy will do so. (*Id.*)[2]

## II.   Analysis

Petitioner argues that he is being unlawfully detained pursuant to 8 U.S.C. § 1226(c), which provides for the mandatory detention of certain criminal aliens during removal proceedings. *See Demore v. Kim*, 538 U.S. 510, 517–18 (2003). Petitioner is

---

[2]   According to HQ/RIO officers, Petitioner has been sending letters and placing phone calls to the Mali Embassy in "continuing and aggressive attempts to thwart his removal." (Second Supp. Pyrd Decl. ¶ 7.) HQ/RIO nevertheless continues to believe that the Mali Embassy will reissue the travel document and Petitioner remains manifested for the ICE charter in late July. (*Id.*)

7

incorrect because he is subject to a removal order that became final when the BIA dismissed his appeal on June 28, 2007. (Pyrd Decl. ¶ 14, Ex. D.) Therefore, Petitioner's detention is governed by 8 U.S.C. § 1231. Under § 1231, the Attorney General is required to detain and secure an alien's removal within ninety days of the commencement of the removal period. 8 U.S.C. § 1231(a)(1)–(2). If an alien cannot be removed within the ninety-day removal period, the Government may either release the alien under an order of supervision or, for certain classes of aliens, continue to detain them until their removal can be secured. *See* 8 U.S.C. § 1231(a)(6).

In *Zadvydas v. Davis*, the Supreme Court held that "an alien's post-removal-period detention" may not exceed "a period reasonably necessary to bring about that alien's removal from the United States." 533 U.S. 678, 689 (2001). The Court elaborated that it is presumptively reasonable for the Government to detain an alien for six months following the start of the statutory removal period, after which the validity of continued detention depends on whether there is a "significant likelihood of removal in the reasonably foreseeable future." *Id.* at 701. An alien can seek conditional release after the six-month period expires by "providing 'good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future,' which then requires the government to 'respond with evidence sufficient to rebut that showing.'" *Ahmed v. Brott*, Civil No. 14-5000 (DSD/BRT), 2015 WL 1542131, at *3 (D. Minn. Mar. 17, 2015) (quoting *Zadvydas*, 533 U.S. at 701); *see also Williams v. Sessions*, Civil No. 18-2633 (DSD/SER), 2019 WL 234350, at *3 (D. Minn. Jan. 16, 2019). "The longer the alien's post-removal detention, the easier it is for him to satisfy his initial burden . . .

because 'what counts as the reasonably foreseeable future shrinks as the period of prior postremoval detention grows.'" *Ahmed*, 2015 WL 1542131, at *3 (quoting *Zadvydas*, 533 U.S. at 701).[3]

Petitioner's removal period, as noted above, commenced on June 28, 2007. He was detained by immigration officials from July 20, 2007 until October 10, 2007, from June 10, 2009 until August 9, 2009, and finally, from October 4, 2018 until the present. As of this writing, Petitioner's current detention from October 2018 has lasted just over eight months, and his two previous detention periods equal just under five months of detention, for an approximate total of thirteen months of detention. *See, e.g.*, *Kaijage v. Johnson*, No. 3:19-cv-294-S-BN, 2019 WL 2290001, at *2 (N.D. Tex. Apr. 17, 2019); *Sied v. Nielsen*, No. 17-cv-06785-LB, 2018 WL 1876907, at *6 (N.D. Cal. Apr. 19, 2018) ("Several courts have held that the six-month period does not reset when the government detains an alien under 8 U.S.C. § 1231(a), releases him from detention, and then re-detains him again."); *Chen v. Holder*, Civ. No. 6:14-2530, 2015 WL 13236635, at *2 (W.D. La. Nov. 20, 2015).

Thirteen months is a significant amount of time, but ICE has now received a travel document for Petitioner from the Republic of Mali, and ICE fully expects an updated travel document to be reissued for the late July West African ICE charter. Even where, as

---

[3]   Courts have found no significant likelihood of removal in five circumstances: (1) the detainee is stateless and no country will accept him; (2) the detainee's country of origin refuses to issue a travel document; (3) the United States does not have a repatriation agreement with the detainee's native country; (4) the political conditions in the detainee's country of origin render removal virtually impossible; and (5) the delay in issuing travel documents warrants an inference that the documents will likely never issue. *Ahmed*, 2015 WL 1542131, at *3 (collecting cases); *Williams*, 2019 WL 234350, at *3.

here, the presumptively reasonable six-month *Zadvydas* detention period expired long ago, ICE's procurement of a travel document is strong evidence that Petitioner will soon be removed. *See Nhean v. Brott*, Civ. No. 17-28 (PAM/FLN), 2017 WL 2437268, at *2–*3 (D. Minn. May 2, 2017) (finding that where "the presumptively reasonable six-month *Zadvydas* detention period" has "long since passed," the issuance of a travel document "constitutes evidence rebutting [the] showing there is no significant likelihood of removal in the reasonably foreseeable future"). Soon after receiving the travel document, ICE tried to remove Petitioner via commercial airline, only to have their efforts thwarted by Petitioner's own intransigence.[4] Finally, Petitioner is manifested on a West African charter scheduled to depart in late July. Therefore, this Court concludes that there is a significant likelihood of Petitioner being removed in the reasonably foreseeable future.[5]

---

[4] Petitioner's refusal to cooperate in his own removal provides additional justification to continue his ongoing detention because "where the timing of removal is controlled by an uncooperative alien rather than immigration officials, there is no meaningful way to ascertain the likelihood of removal." *Ndenge v. Gonzales*, Civil No. 07-1726 (MJD/JJG), 2008 WL 682091, at *2 (D. Minn. Mar. 6, 2008) (citing *Lema v. Immigration & Nationalization Serv.*, 341 F.3d 853, 856–57 (9th Cir. 2003)).

[5] Beginning in early June, Petitioner has filed a barrage of documents in support of his petition. (*See* Doc. Nos. 13, 14, 17, 18, 19, 20, 21, 22, 25, 26, 27, 28, 29, 33.) In many of these documents—including a "Motion to Reopen" (Doc. No. 19) that appears to be addressed to the immigration court—Petitioner argues that his immigration proceedings should be reopened for a variety of reasons, including his request for asylum. Petitioner also asserts in various documents that his travel document is fake. (*See* Doc. Nos. 17, 18.) This Court lacks jurisdiction to adjudicate the merits of the immigration court's order of removal, to order the immigration court to reconsider or reopen its ruling, or to address the validity of the travel documents obtained by ICE.

**Recommendation**

Based on the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Petitioner's Petition for a Writ of Habeas Corpus (Doc. No. 1) be **DISMISSED** without prejudice;

2. Petitioner's Motion to Reopen (Doc. No. 19) be **DENIED**; and

3. Judgment be entered accordingly.

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), a party may file and serve specific written objections to this Report within **fourteen days**. A party may respond to those objections within **fourteen days** after service thereof. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Order**

Also before the Court is Petitioner's Motion to Appoint Counsel. (Doc. No. 10.) In civil cases, a *pro se* litigant does not have a constitutional or statutory right to appointed counsel. *See Ward v. Smith*, 721 F.3d 940, 942 (8th Cir. 2013). The Court may appoint counsel in a civil case if it is "convinced that an indigent plaintiff has stated a non-frivolous claim . . . and where the nature of the litigation is such that plaintiff as well as the court will benefit from the assistance of counsel." *Patterson v. Kelley*, 902 F.3d 845, 850 (8th Cir. 2018). When determining whether to appoint counsel for an indigent litigant, the Court considers relevant factors such as the complexity of the case, the ability of the *pro se* litigant to investigate the facts, the existence of conflicting

11

12

testimony, and the ability of the *pro se* litigant to present his or her claim. *Phillips v. Jasper Cnty. Jail*, 437 F.3d 791, 794 (8th Cir. 2006).

After reviewing these factors, the Court finds that the appointment of counsel is not warranted. Petitioner has demonstrated that he can adequately present his claims to the Court. Moreover, this Court's conclusion that this action should be dismissed as premature under *Zadvydas* illustrates that the Court would not benefit from the assistance of counsel.

Therefore, Petitioner's Motion to Appoint Counsel (Doc. No. 34) is **DENIED**.


Dated: July 12, 2019.                *s/ Becky R. Thorson*_____
                                     BECKY R. THORSON
                                     United States Magistrate Judge